

United States Courts
Southern District of Texas
**FILED**
*June 18, 2025*
Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA § § v. § § KEILAN PETERSON (1), § a/k/a "YOUNG JAY," "JAY" § KIMBERLY MARTINEZ (2), § § § Defendants. § | Criminal No. __4:25-cr-328__ UNDER SEAL |

**INDICTMENT**

The Grand Jury charges:

**General Allegations**

At all times material to this Indictment, unless otherwise specified below:

1.  The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

2.  The CSA and its implementing regulations set forth which drugs and other substances are defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

3.  A controlled substance assigned to "Schedule II" meant that the drug had a high

1

potential for abuse, potentially leading to severe psychological or physical dependence, and the drug had a currently accepted medical use in treatment in the United States or the drug had a currently accepted medical use with severe restrictions. A controlled substance assigned to "Schedule IV" meant that the drug had a low potential for abuse relative to the drugs in the higher Schedules, including Schedule II; the drug had a currently accepted medical use in treatment in the United States; and abuse of the drug could lead to limited physical dependence or psychological dependence relative to drugs in the higher Schedules, including Schedule II.

4. Pursuant to the CSA and its implementing regulations:

   a. Oxycodone was classified as a Schedule II controlled substance. 21 C.F.R. § 1308.12(b)(1)(xiii). Oxycodone, sometimes prescribed under brand names, including Roxicodone, was used to treat severe pain. Oxycodone, as with other opioids, was highly addictive.

   b. Hydrocodone was classified as a Schedule II controlled substance. 21 C.F.R. § 1308.12(b)(1)(vi). Hydrocodone, sometimes prescribed under brand names including Norco, Lortab, and Vicodin, was used to treat severe pain. Hydrocodone, as with other opioids, was highly addictive.

   c. Carisoprodol, was classified as a Schedule IV controlled substance. Carisoprodol, sometimes prescribed under the brand name Soma, was a purported muscle relaxant and was highly addictive. The FDA recommends carisoprodol only for acute treatment for two to three weeks at a time.

5. It was well known that the combination of high-dose opioids, including oxycodone or hydrocodone and carisoprodol significantly increased the risk of patient intoxication and overdose. Moreover, prescribing oxycodone or hydrocodone and carisoprodol often created a significant risk of diversion because the two drugs, prescribed together, were often highly abused and sought for a non-legitimate medical purpose due to the increased "high" a user could experience from taking hydrocodone or oxycodone along with carisoprodol.

6. Accordingly, for a treating physician to prescribe the combination of high-dose opioids and carisoprodol for a legitimate medical purpose, the physician needed to determine, at a

minimum, that the benefits of the drugs outweighed the risks to the patient's life.

7. Medical practitioners, such as physicians, pharmacists, and nurse practitioners, who were authorized to prescribe, dispense, or distribute controlled substances by the jurisdiction in which they were licensed to practice, were authorized under the CSA to prescribe, dispense, or otherwise distribute, controlled substances, if they were registered with the Attorney General of the United States. 21 U.S.C. § 822(b). Upon application by the practitioner, the U.S. Drug Enforcement Administration ("DEA") assigned a unique registration number to each qualifying medical practitioner including physicians, pharmacies, and nurse practitioners.

8. Chapter 21 of the Code of Federal Regulations, Section 1306.04 governed the issuance of prescriptions and provided, among other things, that a prescription for a controlled substance "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of [the CSA] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

9. Chapter 21 of the Code of Federal Regulations, Section 1306.06 governed the filling of prescriptions and provided: "A prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice and either registered individually or employed in a registered pharmacy, a registered central fill pharmacy, or registered institutional practitioner."

10. All prescriptions for controlled substances were required to be "dated as of, and signed on, the day when issued and [ ] bear the full name and address of the patient, the drug name,

strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner." 21 C.F.R. § 1306.05(a).

11. In a Texas clinical setting, only physicians who were licensed to practice medicine were permitted to prescribe Schedule II controlled substances, including oxycodone and hydrocodone.

12. In a Texas clinical setting, a physician could not delegate to a non-physician the authority to issue prescriptions for Schedule II controlled substances.

13. The Texas Administrative Code Section 195.2 required a pain management clinic to obtain a certificate from the Texas Medical Board. The Texas Administrative Code Section 195.1 defined a pain management clinic as a "publicly or privately owned facility for which a majority of patients are issued, on a monthly basis, a prescription for opioids, benzodiazepines, barbiturates, or carisoprodol, but not including suboxone." Texas codified Minimum Requirements for the Treatment of Chronic Pain in Section 170.3 and 170.9 of the Texas Administrative Code.

14. The Texas Prescription Monitoring Program ("PMP") was a database of all reported prescriptions for controlled substances that were issued and dispensed in Texas. The database was maintained by the Texas Department of Public Safety ("DPS") until September 1, 2016, and thereafter by the Texas State Board of Pharmacy ("TSBP"). For all controlled substances dispensed, pharmacies were required to report to the PMP details including: the patient's name, the particular controlled substance and dosage dispensed, the quantity dispensed, the number of days supplied, the prescribing physician's name, the date the prescription was issued, the dispensing pharmacy's name, the type of payment, and the date the controlled substances were dispensed.

15. The Code of Federal Regulations, Title 21, Part 1311 governed the electronic submission of prescriptions by DEA registrants and the use of digital certification and private key. Only the DEA registrant could access and use his or her digital certification and private key. 21 C.F.R. § 1311.30(a).

16. A "crew leader" was someone who often found and often paid individuals, some of whom were homeless or impoverished, to pose as chronic pain patients; often transported them (often in groups) to a clinic; often coached them to fill out patient intake documentation to support a prescription for pain medication and paid for the "visit with the doctor" (i.e., the illegitimate prescription); often took the patient (or just the illegitimate prescription) to the pharmacy; and often paid for and took control of the prescription drugs, many times to divert and sell them on the street for profit.

17. A "runner" was an individual who often worked for a crew leader and "ran" or coordinated taking the individuals posing as patients to clinics and pharmacies to obtain controlled substances. A runner often transported the patients to the clinics or pharmacies for the crew leader, and often paid the patients, clinics, and pharmacies on the behalf of the crew leader.

**Entities, Defendants, and Relevant Individuals**

18. Relief Medical Center, also known as Broadway Medical Clinic, Clear Wellness 2, and Relief Care Group, ("Relief Medical"), was an unregistered pain management clinic located at 2101 Crawford, Suite 300, Houston Texas 77003 and 3208 Broadway Street, Houston, Texas 77017.

19. GroveCare, Inc. ("GroveCare") was a unregistered pain management clinic located 525 N. Sam Houston Parkway, Suite 245, Houston, Texas 77060.

20. Northstar Healthcare Systems Inc, Northstar Imaging Center, Northstar Urgent

Care, Northstar Surgery Center, and MRI Xpress, LLC were all corporate entities or assumed names owned by **PETERSON** and associated with **PETERSON**'s business operations and an MRI facility operated by **PETERSON** at 2104 FM 2920 Road, Spring, Texas 77388 ("Spring MRI Facility").

21. Next Level Pharmacy was a pharmacy located at 1110 Texas Parkway, Suite 200, Stafford, Texas 77477.

22. **KEILAN PETERSON**, a resident of Harris County, Texas, owned and operated Relief Medical, GroveCare, Spring MRI Facility, and Next Level Pharmacy. **PETERSON** disguised his ownership interest in these entities through a straw owner or indirect holding companies. **PETERSON** was not a licensed medical professional.

23. **KIMBERLY MARTINEZ**, a resident of Harris County, Texas, was a medical assistant and office manager at Relief Medical and GroveCare. **MARTINEZ** was not a licensed medical professional.

24. Physician 1 was licensed to practice medicine in the State of Texas and allowed his credentials to be used at Relief Medical, where large volumes of controlled substances, primarily oxycodone 30mg and hydrocodone 10/325mg, were prescribed in his name.

25. Physician 2 was licensed to practice medicine in the State of Texas and allowed her credentials to be used at Relief Medical, where large volumes of controlled substances, primarily oxycodone 30mg and hydrocodone 10/325mg, were prescribed in her name.

26. Physician 3 was licensed to practice medicine in the State of Texas and allowed his credentials to be used at Relief Medical and GroveCare, where large volumes of controlled substances, primarily oxycodone 30mg and hydrocodone 10/325mg, were prescribed in his name.

**COUNT ONE**

**Conspiracy to Unlawfully Distribute and Dispense Controlled Substances**
**(21 U.S.C. § 846)**

27. Paragraphs 1 through 26 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

28. From in or around January 2022, and continuing through in or around January 2025, Southern District of Texas and elsewhere, the Defendants

**KEILAN PETERSON**,
and
**KIMBERLY MARTINEZ**

knowingly and intentionally combined, conspired, confederated, and agreed with others known and unknown to the grand jury, to violate Title 21, United States Code, Section 841(a)(1), that is, to knowingly and intentionally distribute and dispense, mixtures and substances containing a detectable amount of controlled substances, including oxycodone and hydrocodone, both Schedule II controlled substances, and other controlled substances knowing and intending the distribution and dispensing was unauthorized because it was not for a legitimate medical purpose and outside the usual course of professional practice.

**Purpose of the Conspiracy**

29. It was a purpose and object of the conspiracy for the Defendants, and others known and unknown to the grand jury, to unlawfully enrich themselves by, among other things: (a) distributing and dispensing controlled substances not for a legitimate medical purpose and outside the usual course of professional practice; (b) generating large profits from distributing and dispensing those controlled substances; and (c) diverting the proceeds from distributing and dispensing those controlled substances for their personal use and benefit.

**Manner and Means of the Conspiracy**

The manner and means by which the Defendant sought to accomplish the purpose and object of the conspiracy included, among other things:

30. **PETERSON** and **MARTINEZ** operated Relief Medical and GroveCare, a purported medical clinic that operated as a "pill mill."

31. **PETERSON** hired and paid Physician 1, 2, and 3 to use their prescribing credentials so **PETERSON, MARTINEZ,** and others could electronically authorize prescriptions for controlled substances, including oxycodone and hydrocodone. Physician 1, 2, and 3 maintained DEA registration numbers and active medical licenses in the State of Texas.

32. The vast majority of prescriptions issued in Physician 1, 2, and 3's name by **PETERSON, MARTINEZ,** and others at Relief Medical and GroveCare were for oxycodone 30mg or hydrocodone 10/325mg, or carisoprodol 350mg, the highest dosage strengths of hydrocodone and carisoprodol, and the highest short-acting dosage strength of oxycodone, and were for same or substantially similar dosage units (pills)—100 to 120 pills of oxycodone or hydrocodone.

33. At times, **PETERSON**, **MARTINEZ**, and others working at the direction of **PETERSON** used the prescribing credentials of Physician 1, 2, and 3 to electronically issue prescriptions for the highly addictive and dangerous combination of hydrocodone and carisoprodol, in high demand in the Houston area.

34. **PETERSON** and **MARTINEZ** obtained purported patients—customers—from crew leaders, runners, and others to visit Relief Medical and GroveCare. Crew Leaders, or **PETERSON** himself, often paid these individuals to pose as patients and obtain prescriptions for controlled substances at Relief Medical and GroveCare.

35. **PETERSON**, **MARTINEZ**, and other employees of Relief Medical and

GroveCare accepted cash only—approximately $300 to $350 for hydrocodone, and approximately $500 for oxycodone—from crew leaders, runners, and patients in exchange for prescriptions for oxycodone, hydrocodone, carisoprodol, and other drugs that **PETERSON** and **MARTINEZ** knew and intended were without a legitimate medical purpose and were issued outside the usual course of professional practice.

36. When a patient brought to Relief Medical or GroveCare did not receive a desired prescription from the pharmacy, **PETERSON**, **MARTINEZ** and others at their direction charged a $50 fee for the prescription to be rerouted to a different pharmacy.

37. **PETERSON** also required the "patients" at Relief Medical make payments totaling approximately $300 toward an MRI at his Spring MRI facility. The MRI visit was mandatory by every fifth visit. This MRI machine was often broken or the MRI reports were not actually ordered and/or used by practitioners at Relief Medical. **PETERSON** required an MRI visit to make the illegal diversion operation appear legitimate and to further enrich himself.

38. At **PETERSON**'s direction, physicians almost never saw, examined, nor interacted with the individuals to whom **PETERSON**, **MARTINEZ**, and others electronically authorized prescriptions for oxycodone, hydrocodone, or carisoprodol with Physician 1, 2, and 3's prescribing credentials. Instead, nurse practitioners usually conducted perfunctory encounters with putative patients, seeing up to 30 patients in a day. **PETERSON** and **MARTINEZ** knew such prescriptions were unauthorized, were issued without a legitimate medical purpose, and were outside the usual course of professional practice.

39. Between in or around 2022 and in or around 2025, over 2 million controlled-substance pills of oxycodone 30mg, hydrocodone 10/325mg, and carisoprodol 350mg prescriptions, including over 250,000 pills of oxycodone 30mg, over 1.3 million pills of

hydrocodone 10/325mg, and over 720,000 pills of carisoprodol 350mg prescriptions—the highest dosage strengths of hydrocodone and carisoprodol, and the highest short-acting dosage strength of oxycodone were issued using the prescribing credentials of Physician 1, 2, and 3 at Relief Medical and Grove Care—the vast majority of which were unauthorized, were issued without a legitimate medical purpose, and were outside the usual course of professional practice.

40. After **PETERSON**, **MARTINEZ**, and others electronically authorized prescriptions for hydrocodone, oxycodone, and carisoprodol at Relief Medical and GroveCare, crew leaders and runners filled, or had the individuals posing as patients fill, those prescriptions at Houston-area pharmacies. Crew leaders and runners obtained these unlawful prescriptions and pills from Relief Medical and GroveCare and dispensed by pharmacies to sell the pills on the black market.

41. **PETERSON** also owned and operated Next Level Pharmacy, but used a straw owner as the purported owner of the business to disguise his involvement. **PETERSON, MARTINEZ**, and others electronically authorized prescriptions for controlled substances to Next Level Pharmacy using the prescribing credentials of Physician 1, 2, and 3—the vast majority of which were unauthorized, were issued without a legitimate medical purpose, and were outside the usual course of professional practice.

42. On August 15, 2023, DEA investigators conducted a search of discarded trash left on the curb of **PETERSON**'s primary residence, 3926 Childress Street, Houston, Texas 77005. Investigators located miscellaneous mail and other items addressed to **PETERSON**. Investigators also found several Next Level Pharmacy prescription bags, Next Level Pharmacy patient receipts/leaflets, and several medication prescription pill bottles from Next Level Pharmacy, prescribed by Physician 3:

    a.    Seven empty medication prescription pill bottles containing patient names J.A., A.L.S., M.B., S.L.P., A.S.B., A.L.B., and S.H.S. labeled as Oxycodone 30 mg;

    b.    Eight empty medication prescription pill bottles containing eight different patient names C.G., L.J., A.M., S.S., A.C., M.B.G., J.D.S, and L.G. labeled as Hydrocodone-Acetaminophen 10-325 mg; and

    c.    Several full medication prescription pill bottles containing non-controlled substances, including Ibuprofen, Omeprazole, Esomeprazole Magnesium, Famotidine, Amlodipine Besylate, with different patient names.

43. On September 12, 2023, DEA investigators conducted a second search of discarded trash left on the curb of **PETERSON**'s primary residence, 3926 Childress Street, Houston, Texas 77005. Investigators located two more full prescription pill bottles containing non-controlled substances and several paper receipts reflecting cash payments for medical visits, each receipt contained a different patient name. An analysis of PMP data revealed these patients names corresponded to the prescriptions issued by Physician 3.

44. On October 18, 2023, DEA investigators executed a search warrant at **PETERSON**'s primary residence 3926 Childress Street, Houston, Texas 77005. Investigators located

    a.    92.95 grams of lose Oxycodone pills in a zip-lock bag inside a closet desk drawer, as depicted below; and



b. Five medication prescription pill bottles containing five different patient names L.D., B.B., J.A., S.S., A.S.B, as depicted below:



45. Between in or around 2022 and in or around 2024, over 26,000 controlled-substance pills of oxycodone 30mg, hydrocodone 10/325mg, and carisoprodol 350mg prescriptions, including over 7,200 pills of oxycodone 30mg, over 12,883 pills of hydrocodone 10/325mg, and over 5,800 pills of carisoprodol 350mg prescriptions—the highest dosage strengths of hydrocodone and carisoprodol, and the highest short-acting dosage strength of oxycodone were issued using the prescribing credentials of Physician 1, 2, 3, and other physicians through Next

12

Level Pharmacy—the vast majority of which were not for a legitimate medical purpose, outside the usual course of professional practice, and in an unauthorized manner.

46. The proceeds were disbursed to the Defendants, their coconspirators, and others, and the Defendants each personally profited between hundreds of thousands of dollars and tens of millions of dollars from the drug diversion scheme.

All in violation of Title 21, United States Code, Section 846.

### COUNTS 2–7
**Unlawfully Distributing and Dispensing Controlled Substances and Aiding and Abetting**
**(21 U.S.C. § 841 & 18 U.S.C. § 2)**

47. Paragraphs 1 through 43 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

48. On or about the dates specified below, in the Houston Division of the Southern District of Texas and elsewhere, Defendants specified below, aiding and abetting and aided and abetted by each other and others known and unknown to the Grand Jury, did knowingly and intentionally distribute and dispense the controlled substances alleged below, knowing and intending that such distribution and dispensing was unauthorized:

| Count | Defendants | Controlled Substance(s) | Pills | On or About | "Patient" |
|---|---|---|---|---|---|
| 2 | PETERSON and MARTINEZ | Hydrocodone 10-325 MG | 110 | 2/1/2024 | H.R. |
| 3 | PETERSON | Oxycodone 30 MG | 100 | 9/1/2023 | L.D. |
| 4 | PETERSON | Oxycodone 30 MG | 100 | 8/8/2023 | B.B. |
| 5 | PETERSON | Oxycodone 30 MG | 100 | 9/1/2023 | J.A. |
| 6 | PETERSON | Oxycodone 30 MG | 115 | 9/4/2023 | S.S. |
| 7 | PETERSON | Oxycodone 30 MG | 116 | 9/8/2023 | A.S.B. |

All in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), (b)(2) & Title 18, United States Code, Section 2.

## COUNT 8
### Possession with Intent to Distribute a Schedule II Controlled Substance and Aiding and Abetting
### (21 U.S.C. § 841 & 18 U.S.C. § 2)

49.     Paragraphs 1 through 43 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

50.     On or about October 18, 2023, in the Southern District of Texas, Defendant

### KEILAN PETERSON

aiding and abetting, and being aided and abetted by others, did knowingly and intentionally possess with intent to distribute Schedule II controlled substances, namely substances containing detectable amounts of Oxycodone, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(2), and Title 18, United States Code, Section 2.

## COUNTS 9-13
### Engaging in a Monetary Transaction in Property Derived from Specified Unlawful Activity (18 U.S.C. § 1957 & 18 U.S.C. § 2)

51.     Paragraphs 1 through 43 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

52.     On or about the dates specified below, in the Houston Division of the Southern District of Texas, and elsewhere, Defendant

### KEILAN PETERSON

aiding and abetting and aided and abetted by others known and unknown to the Grand Jury, did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, unlawful distribution of a controlled substance, in violation of Title 21, United States Code,

Section 841(a)(1); and conspiracy to distribute a controlled substance, in violation of Title 21, United States Code, Section 846, as follows:

| Count | Bank Account | Account Owner | Signatory | Amount | Date | Description |
|---|---|---|---|---|---|---|
| 9 | PlainsCapital Bank Acct. Ending #9602 | Northstar Health Care System Dba Relief Medical Center | Keilan Peterson | $51,960 | 8/22/2022 | Cash Deposit |
| 10 | Colorado CU Acct. Ending #0010 | Keilan D. Peterson | Keilan D. Peterson | $140,000 | 10/11/2022 | Purchase of 5821 NW 127th St., Oklahoma City, OK 73142 |
| 11 | PlainsCapital Bank Acct. Ending #5201 | Keilan D. Peterson | Keilan D. Peterson | $80,083.84 | 10/11/2022 | Purchase of 5821 NW 127th St., Oklahoma City, OK 73142 |
| 12 | Colorado CU Bank Acct. Ending #0010 | Keilan D. Peterson | Keilan D. Peterson | $100,000 | 9/14/2022 | Purchase of 890421 S. 3480 Rd., Chandler, OK 74834 |
| 13 | PlainsCapital Bank Acct. Ending #5201 | Keilan D. Peterson | Keilan D. Peterson | $400,000 | 9/22/2022 | Purchase of 890421 S. 3480 Rd., Chandler, OK 74834 |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## NOTICE OF CRIMINAL FORFEITURE
### (21 U.S.C. § 853(a))

53.     Pursuant to Title 21, United States Code, Section 853(a), the United States of America gives notice to Defendants,

**KEILAN PETERSON**, and
**KIMBERLY MARTINEZ**

15

that upon conviction of an offense in violation of Title 21, United States Code, Sections 841 and 846, the following is subject to forfeiture:

    a.    all property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such violation; and

    b.    all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

Pursuant to Title 21, United States Code, Section 853(a), the United States of America gives notice to Defendants,

**KEILAN PETERSON**, and
**KIMBERLY MARTINEZ**

that upon conviction of an offense in violation of Title 21, United States Code, Sections 841 and 846, the following is subject to forfeiture: all property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such violation; and all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

The property subject to forfeiture includes, but is not limited to:

    a.    Approximately $27,349.00 in U.S. currency;

    b.    Assorted jewelry valued at approximately $22,975.00;

    c.    Approximately $111,155.32, constituting the net proceeds from the sale of real property located at 30825 Washington Road, Calhan, Colorado, 80808;

    d.    Real property located at 5821 NW 127th Street, Oklahoma City, Oklahoma 73142;

    e.    Real properties located at 890421 S. 3480 Road, 890423 S. 3480 Road, 890425 S. 3480 Road, and 890281 S. 3480 Road, Chandler, Oklahoma, 74834

**NOTICE OF CRIMINAL FORFEITURE**
**(18 U.S.C. § 982(a)(1))**

54. Pursuant to Title 18, United States Code, Section 982(a)(1), the United States of America gives notice to Defendant,

**KEILAN PETERSON**

that upon his conviction of an offense in violation of Title 18, United States Code, Section 1957, any property, real or personal, involved in such money laundering offense, and any property traceable to such property, is subject to forfeiture.

**Money Judgment and Substitute Assets**

The United States will seek the imposition of a forfeiture money judgment. In the event that a condition listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of the Defendant in substitution up to the total value of the property subject to forfeiture.

A TRUE BILL

Original Signature on File

_____
FOREPERSON

NICHOLAS J. GANJEI
UNITED STATES ATTORNEY

*Kathryn Olson*
KATHRYN OLSON
CHRISTINE LU
ASSISTANT UNITED STATES ATTORNEYS
U.S. ATTORNEY'S OFFICE FOR
THE SOUTHERN DISTRICT OF TEXAS